The next case for argument is 18-1197, BrunetX v. Cisco. My partner, Lauren Fletcher, I represent Apple. I'd like to focus our argument time today on three errors. Before you get into that, so I won't have to interrupt you, I'm assuming you haven't made any arguments, so I don't want to create a new one. I just want to confirm that's not an issue before us. If we were to conclude, let's say, for example, that the Cisco patent, the Cisco patent, the Cisco re-exam lives after the appeal we just read, there's still, we're confirming, we're getting rid of one of the patents here that was a subject of damages, but I'm assuming that everybody has assumed they all rise and fall together, and so even though if one patent is gone in the earlier re-exam case, that doesn't affect the damages here. That's two parts of the answer to the question. Do you understand the question? Yes, I do. There is, for the other patent, not addressed by the Cisco re-exam, there is another re-exam that's being briefed to the court right now for that patent, for the 511 patent that will come to the court, so it's on its way, but to answer your question precisely, no one is contesting the royalty rate across the patents. There would probably have to be a remand for determination of the number of units to which it applied because there are different products at different periods of time that might have infringed the different claims, and so I think, as I'm trying to be as precise as I can, you have to sort of distinguish between rate, which no one contested across the patents, and the question of the units to which they apply because they will differ by time period. Wait, I don't understand that. I don't understand, and you didn't make that argument in your briefs. It's clearly teed up to you because the only argument being made in the re-exams is that there's final, and those two should go away, basically, but one, on Cisco, I mean, they're making arguments on the merits, but they haven't made arguments related to the final decision on that, so then when we're talking about district court, I don't see anywhere in your brief any sort of claim, and show me if I'm wrong where, that there ought to be a remand if we do in the other re-exam, in the re-exam scenario what you're trying to do. Your Honor, that issue is not, the issue addressed in these briefs are what happens if the court decides that Mr. Weinstein's second go at the damages is equally inadmissible, and that, to go back to Judge Post's question from the last argument, that would result in a remand. We did not address the question, I don't think any of us did, of what happens if you take the collection of these three appeals that you've heard today, and there's a variety of different possible results. If the first two were affirmed, then this case would become moot. If one case was, if the IPR case was reversed for some reason, but the re-exams were affirmed, that's another circumstances. No one has, and then, to go to your question, Judge Post. Which I'm now very sorry I asked. Me too, me too. So I, the answer, did either of us say, here are the different permutations and combinations, and here are the possibilities? No, what we said is, that if the damages were incorrect, they would have to be remanded for determination. The question of how these work together, remember at the time of the briefing, some of these, we didn't know we were all going to be here on the same day. Okay, and we'll ask if Mr. Lampkin can remember, even if I don't, to just take a couple minutes at the beginning to address that point. Okay, I'm sorry. So the three questions I'd like to focus on are, the claim, the court's claim construction of anonymity, and the infringement judgment based upon face time. Second, Mr. Weinstein's second pass at damages. And the question of whether he has apportioned them, or whatever you call what he's done, whether he's given you a reliable and sufficiently robust damages theory that it should have been admissible. And third, the question of the submissibility of the $1.3 billion number, which is supposedly a design around number, but a number that was not used in the damages computation, and really was used to prove infringement. Let me ask you a question about this last issue. Did the court issue an order, or say that the $1.3 billion redesign figure was not to be put before the jury? Your Honor, the answer is yes. He instructed that the issue was, not that it wasn't to be put before the jury, but the information was to come in as relevant to damages. Now, you know, there are some... Do I understand this correctly, that the $1.3 billion figure was actually never made part of the methodology for damages? You're 100% correct. And so, Your Honor, to go to that issue precisely, the $1.3 billion number, an alleged design around number, was never used by Mr. Weinstein in his Georgia Pacific analysis, was never made a basis for his opinion. The only thing he did is put it out there because it was a check, a Unilock check, on his $300 million number. The second is, he's not the person who computed the $1.3 billion number. The person who did, Mr. Jones, never put it into evidence. And Dr. Mr. Weinstein, you know, knew nothing other than the number. But probably never put what into evidence? The $1.3 billion number. So it came in through Weinstein. It came in through Weinstein just saying it, and then on cross saying it comes from Mr. Jones. And then I think the most important thing, Your Honor, to go to your question about the instruction and what was done with it. Vernetix opened on the number. Vernetix asked every technical expert about the design around. It closed on it. This jury was allowed to ask questions of the witnesses. There was only one question asked during the entire trial. And that question was to our technical expert, and it was, why did Apple design around? If the court looks at the pages that follow, the answer is a technical one. And then Vernetix gets up and does a cross-examination that goes to infringement. Yeah, but let's assume. So let's assume, though, that the judge issued a curative instruction. And there are plenty of cases where, even if we accept everything you're saying, we can say, yeah, and those things happen. And there was clear curative instruction going to the infringement. What confuses me is that instruction says, it's not for infringement. It's for damages. And now Vernetix is telling us that they didn't use it for damages. So if I'm the jury hearing that instruction and the judge is telling me it's not for infringement or for damages, how is anybody arguing that it would have been used for damages? I thought the argument was that it wasn't used for damages. The argument's you're correct. I mean, we said the number had no place in the case because it was not part of Mr. Weinstein's damages theory. To the extent that design arounds can be part of a Georgia-Pacific analysis, to go to Judge Regna's question, it was not used for that purpose. His analysis, which is the six licenses and so on. Right, he said, in fact, that he's not using it. He's not using it. And so at the end of the day, the argument that it should come in was that it was relevant to damages. It was not relevant to damages. It should never have come in. But most of the discussion by Mr. Weinstein came on cross from you all. You can't blame Vernetix for that, right? Well, Your Honor, I don't think you can blame our trial lawyers for that because once it's in, you have to try to address it. I mean, you try to keep evidence like this out, which we did. You try to keep it limited, which we did. But if you think about the fact that it's used as an opening on an infringement issue, it's used in the evidence with every technical expert, not just the defense. OK, well, here's my question. And here's, I think, part of the response from the other side to that. And you know, a jury is a black box, and we don't know what they did or whatever. But in this case, we have a pretty good idea how they got to the damages calculation because it happens to be precisely the number of $302 million, et cetera, et cetera, that Dr. Weinstein was giving for the use of the licenses. True. So whatever you say, there's certainly sufficient record evidence to support where the jury got that number, which doesn't include anything about the $1.3 billion. So even if we're troubled about the $1.3 billion, can't we be pretty secure where the jury came up with its number and has nothing to do with that? The answer, Your Honor, is there are two answers to your question. The first is, you can be secure as to where they got their number. You cannot be secure that the $1.3 billion had no, had nothing to do with their accepting that number. The two numbers that were before you- We say nothing to do with their accepting it. For what purpose? You've argued, I think, unless I'm mistaken, that you're worried they used that number to conclude that you conceded infringement, right? Isn't that what you've argued to us? No, we said two things. We said that it was used to basically suggest that we conceded infringement. Remember, this is- So one of the aspects of why you think this number being introduced to the jury is prejudicial is you think it will impact their infringement determination, correct? True. Okay. So the judge gave a curative instruction on that expressly, didn't it? Right. Didn't he or she? He gave the instruction that Judge Reina identified, but, Your Honor, there are some things that an instruction's not going to cure. But let's assume we don't buy that. So did you make the argument that alternatively, even if it were just used for damages, it was still improper? Yes. Yes, and that's what I was trying to answer to your question, Judge Post. Where did you make that argument? I don't have it off the top of my head. I can get it for you. But we made the argument that- Okay, before your rebuttal. No, it's in our opening brief. In our opening brief, we said that the $1.3 billion was used to go to the second half of my answer to Judge Post's question, if I could finish the thought. Our number was $0.10 a unit, the Microsoft license. Our number would have come to about $30 million or so. That's the Microsoft license. But I guess Judge Post's point is the jury came up with exactly the number that followed the damages experts' analysis identically, and that was the number they came up with. So it doesn't appear as though the jury used that $1.3 billion number at all. Why do we need to be concerned? You're saying it's a private affair trial on damages, but the jury adopted almost exactly what the expert articulated. Actually, exactly, not almost exactly. And I don't understand. Your Honor, this Court has addressed this issue. It's precisely the principle that you addressed in UNILOC, which is if you have competing damages numbers, one's $30 million, one's $300 million. And incidentally, the $300 million is very close to the unapportioned number that you addressed in Furnetics 1. You have these two competing numbers. The jury's trying to decide which one is reasonable. And what UNILOC said is you can't put in these big sales numbers, these big other numbers that's going to make your $300 million number look reasonable. Haven't we expressly held in Douglas Dynamics that availability of non-infringing alternatives and the cost thereof is relevant to a damages analysis? Absolutely, 100 percent, Your Honor. So we've held that this kind of number is relevant. The district court issued a curative instruction saying jury, don't use it for infringement. We have a jury determination on damages which maps identically to an expert's articulation of how damages should be calculated, which didn't even use this number. I'm at a loss. I mean, we talked about prejudice earlier today in one of your earlier cases. I'm at a loss for how you can convince me that there's an abuse of discretion here. That's what you have to convince me of for this. Your Honor, respectfully, the place I would disagree with the logic that you just offered is that... It had three parts. Yeah, the first part. Okay. And the first part is this. You're right. You're 100 percent right that the cost of a non-infringing alternative could be used in a Georgia-Pacific analysis. It wasn't in this case. Not at all. They conceded. It's not the basis for the dispute. So the reason, you know, the place that I would quarrel with logic is... So is your view anytime anything is introduced that turns out not to be utilized by the expert in assessing the Georgia-Pacific factors, it's absolutely off the table? It shouldn't come into evidence. It should not come into evidence, and under UNILOC if it's a number that is so extreme. I mean, remember in this case... But the jury didn't calculate anything based on it. Your Honor, remember in this case, in Vernetics 1 in 2014, we have a $360 million damage number, which this Court said was unapportioned. We go back down with very express instructions from this Court in the opinion on what should be done to apportion. And instead, we just took basically four of the six same licenses, redid the math. Five of them are for small amounts that are litigation settlements with tiny, tiny numbers of damages. Yeah, the problem with that is there's a mix-up in the briefs, and it's nobody's fault, but we keep going back and forth between apportionment and comparability of the licenses. And it seems to me, so moving to damages and away from what's $1.3 billion, it seems to me most of your arguments and maybe they're very good. If I had been on the jury, maybe I would have bought them, which is these licenses were not comparable enough to be using the numbers in those licenses for this case. But the jury... But isn't that a question for the jury? The jury had that question. It obviously believed there was sufficient basis to say, well, the licenses are good enough to adopt Dr. Weinstein's calculations. And aren't we sort of... aren't our hands tied in what we can do with that? You know, absolutely, absolutely not, Your Honor. Now, let me start at the beginning. There was, without a doubt, some of the issues that go to comparability of licenses and some of the issues that go to the question of whether the apportionment overlap. Not so much because they always overlap, but because given the specific methodology that was used by Mr. Weinstein, they will overlap. But in using comparable licenses, is the apportionment problem because they, too, relied on the value... the base of which the numbers were derived from include... Is that your argument on apportionment?  The argument actually on apportionment, Your Honor, is if I turn you to page 21 of our brief, and I do that only because the information on the page is confidential, these are... and I'm over my time, but if I could finish this thought... No, no, no, we're going to cover these. Okay. If I were to turn you to page 21 of our brief, these are the six licenses. And to be very clear on what was done, five of the six licenses are the same type of licenses you addressed in Vernetics 1. They are running royalty rates on the full price of the products. Everything... Microsoft is the only lump sum. Everything else is different. All that Mr. Weinstein did is take the total number of products, the total dollars, divide one into the other, come up with a royalty rate, and then come up with an unweighted average. He just averaged them so that the license that is asked for... No, I understand that, but how does this go to my question, which maybe I'm just not understanding? Is your objection to the individual licenses having... Is your apportionment... I want to know what your apportionment is. The answer, Your Honor, is this, which is... And I'll come back to the licenses. The answer is if you look at this, this methodology, which has a magnitude variation in what the per unit royalty rate is, is not an apportionment. It has nothing to do with the value of the patents. Now, does... Is that because the licenses have different and more patents? Actually, it's a number of different reasons, and this is where they overlap, right? That's right. The licenses involve different patents, but they also involve different products, different periods of time, but most importantly... How is that not a comparability issue? Your Honor... I'm still trying to get to the heart of your apportionment. Actually, it's a separate issue. So there are three issues when you think about the licenses. The question of whether they're admissible, right? You ruled in Vernetics 1 that they are admissible. That doesn't make them reliable for any damage analysis, and the best proof of that is you found them to be admissible in Vernetics 1, but then you struck the damages theory or protocol that was based on it. Okay. So if they're not reliable, give me an apportionment reason why they're improper. So the question then is what is done with the licenses, and there are two issues which overlap. One is the licenses have to be comparable for the... And then you have to use them for a reason that is disciplined and reliable. What we have here is we have a set of licenses that are not comparable. They're settlement agreements. They are a small amount that you can see... So you're not saying, though, that they should have been excluded. You're just saying the jury should have given them less weight because of those arguments. No. So I'm back to where I started, which is isn't that up to the jury? No. Your Honor, I agree with the first half of what you said. It's worth saying that these licenses don't... They're not sufficiently comparable to be comparable, but they're also not sufficient to support the analysis that Mr. Weinstein did. It never should have gone to the jury. And the best indication of that is this page that's before you. And if you just look at it and take from it three things, one is that the variation between the largest license, the one that's closest to Apple, which is Microsoft, and the number that he came up with is a magnitude. The variation between the lowest to the highest is two magnitudes. The highest involve units that are less than, for the most part, 50,000 units. They're litigation settlements of small amounts. But this is all weight. It's not, Your Honor. This is not a feasibility. This all goes to the weight of which license... Your Honor, if that were true, Vernetics 1 would have come out differently. I mean, you took the same issue, the same, not identically. Four of the six licenses are the same. You took the same licenses. The panel decided that they were admissible, right, because you could make them sufficiently comparable. But then what the panel said is, let's look at what was done with them. And that's the Dauber issue. In every Dauber... I'm sorry. Maybe I'm not recalling it. Vernetics 1, we were concerned about the using of the ultimate number for the iPhone or the iPad or whatever, the hundreds of dollars as the base. That was a really different issue. It was, but that was predicated in part upon the licenses where for the five of the six licenses in that case, the base that was used to establish the royalty rate was the full phone. So the issue is addressed in two parts of your opinion. There were three different damages theories addressed, and Your Honor just articulated the first one. When you get to the bulk of the opinion, that's where you're talking about the admissible licenses. But the mere fact the licenses were admissible didn't make any of the three theories sufficiently reliable to go to the jury. So that's where I'm trying to answer your question is, you know, Dauber and Waite overlap, obviously, and where the precise line is, is a matter of judgment. But in the first case, it was decided that it was not a matter of weight. It was an issue of the reliability of the analysis. The same is true here. I mean, if I could, the panel said, Mr. Weinstein, you didn't apportion. We want you to apportion. We get back down to the district court. He admitted the licenses. Yes, yeah. And the licenses are admitted. Then the question is, so tell us how you apportioned based upon these licenses. And the answer is, I can't tell you. I mean, this wasn't the first rodeo. This was the second go-around. And he's asked the question, how did you apportion? And the answer is, I don't know. But isn't it okay then? And have in our cases sort of Erickson and others sort of said, okay, apportionment is one thing, and we get into that with the entire market value rule and all this other stuff. But then we have a principle that you can use comparable licenses to engage it. And that usually, in my recollection, doesn't involve an apportionment question. If you've got somebody who's licensed, let's assume Brunetics here had licensed Samsung for 60 cents. You can use that as a comparable thing. It doesn't matter whether or not we're not going to do an analysis about the Our cases say you can use that value of the license for the accused product to get you where you want to go, leaving aside all those apportionment issues we deal with. Actually, Your Honor, I agree with 90 percent of what you're saying, except I probably would define where you want to get to go as the place that you and I might depart. And here's the reason why. Where you want to get to go is what Gerritsen tells you you have to do. The damages have to be, whether you call it apportioned or valued, you have to value the contribution of the patent. If you're going to use licenses and claim that they're doing that, you don't have to call it apportionment. It's valuing the value of the patent. In the first case, to go to Judge Reagy, the licenses were admissible, but they had not been used in any of the three theories to value the contribution of the patent to the products. So the answer to your question is the licenses, Erickson and the first case, in this case, do say licenses are admitted, but they're admissible for the purpose of valuing the patent. Okay, so on what basis, as I said, that just brings me back to where I started, and I'm sorry. I really have been listening to everything you've said, but it's really your argument. This is what the trial is about. They say these are comparable licenses and we're going to use them. You get to make a whole case making the arguments you've made here. Look at these numbers. There's such a disparity. Look at the different patents that were used. Look at the different accused products. I think you made that argument at trial, and why is it not a jury question as to whether or not they're persuaded? Your Honor, because when you have an expert who's asked the question, how did you apportion? He can't say. And then this, at page 21, is the analysis. The question to this court is, and if you go back to the kind of case that Daubert is, and you think about the science that was involved in Daubert and the difference between an association and causation, you're deciding a very precise scientific issue. The question here is, set aside how we characterize it. I use apportion in part because that was the focus of frenetics one. Look at this chart on page 21. And the question is, in a case where you're claiming hundreds of millions of dollars of damages, is it reliable to take licenses that have some similarities and some differences and merely divide the royalties paid by the total units and take an unweighted average? That is not reliable. You look forever to find a peer-reviewed journal, to find something else that said that's a reliable way to compute damages. And in frenetics one, at the end of the opinion, the panel's opinion said, here's what you have to do. And while the word apportion was used, the predicate, the focus of the argument, of the import of the panel's opinion was, you have to come up with some way to value the contribution of the invention to the products. The only thing you have is this. And an unweighted average of licenses that vary by two magnitudes, with the expert not being able to say, here's why I used them, is not sufficiently reliable to make it to the jury. And that's our argument. All right. And we're not going to let you go to the anonymity infringement question, but we'll take that up. We never got to point one, but thank you. I got two of the three. Good morning, and may it please the Court. Now, you were going to start for a couple minutes, and we're not going to count your time against answering the first question we raised. Absolutely. And I think the answer is this. In what I call the Apple re-exam appeal for the 504 and 211 patents, Cisco didn't challenge a number of the claims that support the FaceTime verdict. And those claims were specifically 1, 2, 5, and 27 of the 504 patent. So if the Court were to hold that Apple has stopped, but Cisco can go forward, then the verdict would still stand. Okay, let me just. Okay, so the FaceTime, the 504, even if we not – Cisco did challenge the 211 stuff. So even if the 211 goes away, it's quite clear that the FaceTime products we were dealing with. And I think the parties agreed, and under Catalina lighting, it just doesn't matter how many patents are infringed. What matters is that there's infringement. And so I think the answer to that question is, I'm sure the answer to the question is, even if the Court were to uphold Cisco's challenge, it goes back to the Board, and the patent claims are canceled, it's not going to have an effect on the verdict so long as we reach final judgment without anything else happening. So I want to talk about whether anything else should happen. And I thought I should start with apportionment, or actually maybe perhaps with the cost of the design around, the cost of the non-infringing alternative. And I think it's important that it was used for a specific and limited and entirely proper purpose. And that was to show that there really wasn't an economically viable design around a non-infringing alternative. And I turned to Paige. And what is the purpose of that? Does that go to your infringement argument? Does that go to the damages argument? Damages only, and I think on page 1912 of the appendix, our expert explains exactly why he looked at that and why he uses it. And he says to an economist, and he's talking about the cost of the non-infringing alternative. And this isn't Dr. Weinstein. This is Dr. Weinstein speaking, and it's on page 1912 of the appendix. To an economist, they set a limit as to what an entity would pay to license a technology. If you find a non-infringing alternative that's relatively inexpensive compared to the license rate, you're going to go with that. So it's going to actually push down, if you have a cheap non-infringing alternative, it's going to push down what the bargaining positions are. And then Apple, in turn, and this is on page 1968 of the appendix, uses it in exactly the same way. I've got to find 1968 first. On their cross. Just to be clear, what I'm reading at 1912, this is the trial testimony of Mr. Weinstein? Correct. That's exactly what he said. And so he did concede that he didn't use it in his calculation in a mathematical sense. He didn't take a percentage of the 1.3 billion, but he used it to inform the nature of the hypothetical negotiation that would occur. And then Apple used it in exactly the same way on cross in 1968. They got our expert, Mr. Weinstein, who conceded that if the peak value, the peak usage would be 287 calls per second, that the cost of this design around using FaceTime through relays would only be $37 million. And they say to him, and says, and you testified yesterday that the cost of a non-infringing alternative in certain circumstances can provide a cap or a limit to damages. Correct? Sure. That's what you testified yesterday, right? I did. So this is an entirely relevant and proper, and the jury instructions themselves identify non-infringing alternative as relevant to damages. The jury was entitled to know that it just was not only technologically inferior. So how does it factor into what the 300 million of the jury concluded? How did they, taking what the testimony was about it, tell me what the jurors were thinking about the 1.3 billion. So the jurors were thinking there's not a technologically or economically good design around that's not infringing. That if you're thinking about going to relays, it's not going to work. And it's also very important that we had to address.  And reject the notion that Apple could just easily design around and rely on relays. And that's actually very important because, and I would like you to turn to page 31 of our brief. We have a diagram there that shows how this works. But one of the things that happens when you have face time is that it has sort of a backup system. So if it can't set up that direct connection, which is the red line in the middle of the diagram in figure five, it will go to a relay server, a non-infringing system because it's not a direct connection. And the jury knew that five to ten percent of the time, the direct connection is going to fail. And you're going to go to the relay server. And so the jury already knows that this relay server, a non-infringing mechanism, is a potential non-infringing alternative. And so we need to tell the jury you can't do that and design around the patent 100 percent of the time because it's going to be worse quality. And we emphasize the drop calls and the lagginess and everything else. And because it costs a lot. And that was the way it was used repeatedly. The design around, the idea of a non-infringing alternative would cost a lot. And I think to emphasize that we never asked, never asked for a portion of the $1.3 billion. It was brought up only in that context. And in fact, it wasn't even used in closing. If you look at the closing, the closing mentions the cost of $51 million for a 21-month period. It says $100 million to design around, but not $1.3 billion. At the end of the day, how much did the design around cost? It was much less than $1.3 billion. Oh, so for an 18-month period, excuse me, a 21-month period, it was $51 million, but it didn't work very well even at $51 million for that 18-month period. And I think if you're going to design a phone system that's stable and robust and works, you design for peak usage. Like when there's an earthquake in Los Angeles and everybody's calling their relatives to see if they're okay, you're going to have to meet that. But if you design around that, that was how much? $35 million? Pardon? $35 million? No, so to establish relays for Apple to try and get around the direct communications link for 21 months, it spent $51 million. But for that $51 million, it got a grossly inferior system, one that blocked calls, one that suffered from... But the jury didn't hear this. Hmm? The jury did not hear this evidence or these facts. The jury heard all of that. It heard about the lagginess, it heard about the dropped calls, it heard about the fact that it was lower quality. But that the design around would cost $51 million? Yes, that number was before the jury as well. That's correct. And since there's an objection to the $1.3 billion number, it's based on the fact that it was relied on a 10,000 calls per second peak capacity estimate. But that wasn't our estimate. That came from the testimony of an Apple engineer. He testified 10,000 calls per second. And it's not an unreasonable number if you think about it. There's 80 million Apple users. And back in 2009, it could well be that Apple's FaceTime was going to replace the phone. So if there's an earthquake in L.A. and everybody starts calling their loved ones, you can have that peak usage. In fact, in Washington, D.C., Verizon has these old five ESS Lucent switches. They have a capacity of 9,000 calls per second for a city of one million people. Apple has 80 times as much. So if we go back from that, and then finally, the court didn't abuse its discretion in admitting it because he clearly said over to the jury, this is not for purposes of infringement. This is to use only for damages. Why don't we move on to the damages? Pardon? Apportionment? Apportionment, yes. Sure. All right. So turning to apportionment then. This court actually previously upheld the admission of four of the six licenses at issue here. And Apple never identifies anything about the two additional licenses that are different. I don't think there's any... But that was upheld in another context. I mean, would you think what we did here would foreclose us from saying here that the licenses shouldn't have been used? I think it did, because actually this court said, the court said, and I'm quoting, it explained that we found no abuse of discretion and it said all differences Apple identified were presented to the jury, which is precisely the point you're making now, allowing the jury to fully evaluate the relevance of the licenses. No more is required in these circumstances. They are the same and no different licenses here as there. But even setting that aside, the licenses were actually used in an entirely permissible fashion. There is no apportionment problem because Vernetix studiously avoided claiming a percentage of any value on the Apple phones that were attributable to something other than Vernetix's products or Vernetix's technology. Apple might have, you know, a $1,200 jewel bezel, it can have a $4,000 thing. Yeah, I know, it's interesting because you kind of prove one. I agree with you. You avoided doing one thing, but did you do enough on the other end, which is you don't have to even prove a negative. You have to show that the value of what you're asking for is related to the value added to the device by the patents. Exactly, and I think, and then the expert did this because each of the devices he looked at, he excluded anything that was, for example, a server or anything that was much more expensive or much different than the way, and he did use VoIP phones and similar items like that. So these are things that use the technology, the easy DNS setup, which allows you to use a DNS to establish a secure link, in the same way as the Apple phones do. Yeah, but if in two contexts, it was a litigation settlement and they had, you know, 400 of these devices that used it, are those numbers really equally as relevant as maybe Microsoft that at least had the same economies of scale that Apple might have? Microsoft was the litigation settlement. Every one of the licenses in the prior case, in Vernetics 1, was a litigation settlement, and this court said no abuse of discretion. These are all arguments that go to weight, and the jury heard them all. And frankly, I don't think that they, basically what Microsoft's argument is here is, look, we have a multifunction device, and our multifunction device values this secure setup technique less, and our users value it less, than, for example, a $250 VoIP phone. That's a fair argument to make to a jury, but it's not something that excludes all of the other licenses for the same technology that uses it in the same way. The question for the jury is, what is the value added by the accused devices in Apple's product? Exactly. It has very little to do with all of this other stuff. Well, it has a lot to do with it, because those products, those VoIP phones, use the same product, and the same technique, the same patented technology, in the same way. They use it to easily establish a secure communications link. And that secure communications link is the same thing that Apple's using on its phones. And in fact, if there's an argument to the jury about who values this easy way of setting up secure communication links more, Apple's phones, or a VoIP phone on the table, it's going to be Apple's phones. Because the Apple phone is moving from network to network, from NAT to NAT, from place to place, and it's going to have to constantly go through and set up these secure communications links when it's on the run. The VoIP phone may not have to do that. This is precisely the type of argument Microsoft could make and did make to the jury. But the licenses are, the district court did not abuse its discretion in holding their comparable, and it didn't abuse its discretion in allowing Mr. Weinstein to use them. And the jury was simply persuaded that these were comparable licenses, and that this was an appropriate royalty. Should I turn for a moment to the issue, oh, one thing I should point out about that is, I know that the results of the first case and the results in this case in terms of the royalty are actually quite different, because you have to take the number of units into account. The first case was $368 million on approximately 175 million units. This case was $302 million, about 20% less, on 252 million units, about 50% more units. So if the court has any question about whether or not its decisions on how royalties are calculated in methodologies makes a difference, they make a difference. They made a big difference here. If I can turn very quickly. If you turn to something he didn't cover, you allow him to talk about it. If you sit down, you don't. So I take it then the court is asking me if there's, then if the court doesn't have any other questions, we'd be happy to cede our remaining time to the court. Thank you very much. Very briefly, Your Honor. I think to correct something, which I'm pretty sure is correct, and to answer your question of Mr. Lamkin at the outset, in this re-exam, the one that's before you now, the first one, the one that we argued, the re-exam covers the same claims of the 211 patent that were an issue at the district court. So they actually are the same. And so one would have an effect on the other. And then the question of, after that, of what you... I'm sorry, I don't understand. He stood up here and said in the Cisco re-exam, there were a number of claims that are not included, that are in the district court litigation that are not included in the Cisco re-exam. Am I understanding what you said correctly? Yes or no, please. Sort of. Challenged by Cisco. They're not challenged by Cisco, challenged only by Apple. Okay. I don't think that's correct. If I were to break it down for you, on the 211 patent, which is the subject of the re-exam... Which was Cisco's. Let's look... Can we talk... Are we all talking about just what remains from the Cisco re-exam and striking out the Apple re-exam? Yes. And the claims that are subject to the Cisco re-exam, the 211, are the same claims, covers the same claims asserted in the litigation. So I may have it wrong. That's true, but not the 504. I don't think there's a difference. I mean, you're agreeing, but do you also agree that the 504 patent, which is also the subject of damages in this case, was not covered by Cisco's re-exam. It was only covered by Apple's re-exam. So that stands if we throw out Apple's re-exam. Except for something that I mentioned to Your Honor in my primary argument, the second appeal, which is there is a separate re-exam appeal on... Yeah, but that's a separate re-exam. It doesn't have anything to do with this case. Right. Or any of the cases in front of us today. It does, Your Honor, because it's a fully briefed appeal that will come to this court that covers the 204. So you think that we should not affirm a district court decision because there's some separate re-exam in the pipeline. No, I'm trying to answer Judge Prost's question, which is just looking at the claims, what's involved, and there's a re-exam that you heard today, which was... And her question was limited, as I understood it, to if we kick the Apple re-exams and the Cisco re-exams remain, how does that affect the damages resulting in the district court litigation? You're saying it doesn't affect it at all, but there is a separate re-exam in the pipeline that might. No. That's what I'm saying. This is why I was trying to be precise. It does not... It would have an effect on the 211 patent claim. And I agree. Why don't we move on? I want to really cover the $1.3 billion issue and briefly in the damages. Yeah, so very quickly. On the damage issue, if the court considers the Vernetics 1 opinion at page 1229 and the two paragraphs immediately preceding subsection C of your opinion, what you say is, in the end, Vernetics should have, and then you tell Vernetics what it should do to sustain a damage claim of this magnitude. They didn't do that. If the analysis at page 21 of the brief that I drew your attention to actually was a reliable methodology and a sufficiently disciplined methodology to do what Gerritsen tells us to do, if you have to value the technology, why would it vary by two magnitudes? If it were a reliable methodology, why would the result vary by two magnitudes? The answer, Your Honor, is to your question, which is there is this place where comparability and his analysis overlap, and the fact that only one of them is even arguably comparable, five of them include products that are very different by his own admission. Five, they're all litigation settlements. So would you have us say the court abused its discretion by allowing the evidence in, or are you just saying that just this evidence is... What are we to do with your argument? I think, Your Honor, we take it as a doubter argument, and the question is, is the evidence, is the theory that he's offered and the method in which the theory's been implemented sufficiently reliable to satisfy what Gerritsen and what Your Honor said, whether called a portion or something else? And the answer is no. And the definitive answer to that is just looking at the results of the analysis. Gerritsen himself does say you have to account for the differences. Last point on the 1.3 billion. In some sense, you can't have it, you shouldn't have it both ways. If you really can do this math and come up with $1.20 a unit on the unweighted average and say that's the value of the patent from these real-world licenses, then the 1.3 billion is not tied to any damage analysis at all, had no business being in the trial. And the best indication of that is if you look at where the jury asked the question... Well, didn't Mr. Weinstein testify that that would constitute a cap? No, he didn't call it a cap. I thought that was the exact page that I read from the testimony. He did, but what Mr. Lampkin drew your attention to, is what he in fact said. But he's not tying it to his damages amount. Yes, but he said that value, he didn't use the number 1.3 billion, I don't think, in that sentence, but he said that value would constitute a cap, really. And it makes sense, right? Because if Apple could redesign for 51 million, they would surely do that rather than pay $300 million in damages. Your Honor, I think that is exactly... So he did tie it expressly to his damages analysis, because he called it the cap on what would otherwise be damages, which demonstrated why his number was so reasonable in my comparison. Your Honor, there's two answers to that question. If that were true, then Unilock would be setting aside what Unilock said about putting in these checks for your numbers. And Unilock says, you can't do that, particularly if you're not tying them. The second thing is... But didn't you also put in a number? Isn't he right that you put in a number for redesign before the jury at $51 million? Actually, Your Honor, that's the second point. That went into evidence for sure. So you can put in a redesigned number, but they can't because their number's too high and you don't like it. No, Your Honor. What happened... Well, actually, the answer is yes, but you might have an alternative explanation as well. Go ahead. No, Your Honor, I think the answer is that the right thing for a trial lawyer to do is move under a doubt or to exclude it. If it's excluded, it's excluded. No one gets to it. If it's not excluded, then you have to do your best to deal with it in front of the jury. But it doesn't mean that you've waived your right to demonstrate that it should have been excluded in the first instance. We're coming back to go to Judge Crow's question to the first instance. And the question here really is, if you have this $1.3 billion number, it's not used by Mr. Weinstein to compute the $300 million number, which is used during the evidence to basically suggest... Remember this design around results from the first verdict at a point in time when the case is on appeal, there's a design around implemented, and for face time, we prevailed on that appeal and got a remand. That's when this design around is occurring. And for that reason, it was particularly prejudicial that it went in. And the $51 million number, Your Honor, just so you know, if you look at Appendix 1199... Let's move quickly, Mr. Lee. Sure. Let's talk about the prejudice. So what happened? What are you saying that the jury did? It inflamed their passion? It caused them to think that damages would be higher or that we're unable to separate the 1.3 billion from the other damages calculations? Your Honor, it's a great question. There are two answers to it. The first is they didn't separate damages from infringement. And the best indication of that is the question they asked of our expert. Why did Apple adopt the redesign? So it not only crept over, it basically just put a wave, a tsunami, over the infringement question. The second is the discussion I was having with Judge Moore. Putting that big number out that it's not tied is prejudicial because it makes that $300 million number look reasonable. The appendix site I was going to give you is A1199. To answer your question, the $51 million number went in when Furnetics offered it in its opening. Okay. Thank you. We thank both sides for their cases. And then that concludes our proceedings. I'm sorry.